IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF ILLINOIS
WESTERN DIVISION

| | | |
|---|---|---|
| Peter Koehn, | ) | |
| | ) | Case No. 12 C 50321 |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | |
| | ) | |
| Lauri Tobias, et al., | ) | |
| | ) | Judge Philip G. Reinhard |
| Defendants. | ) | |

## ORDER

For the reasons stated below, defendants' motion [87] for summary judgment is granted. Defendants' motion to strike contained in their response [101] to plaintiff's statement of additional facts and their motion [104] to supplement are denied. Judgment is entered in favor of defendants and against plaintiff on all claims. This case is terminated.

## STATEMENT-OPINION

Plaintiff, Peter Koehn, brings this action against defendants, Lauri Tobias, Margaret Segersten, Ken Book, Richard Stoxen, Mark Stricker, Roger Wilhoit, Rebecca Klein, Sharon McMillan, and Diana Bird.[1] Tobias is the superintendent of the Harvard School District ("District"). Segersten is the principal of the District's junior high school. The remaining defendants are members of the District's school board. Plaintiff claims he was terminated from his tenured job as a school psychologist with the District in violation of his First Amendment rights (Count I) and without constitutionally required due process (Count II). Defendants move [87] for summary judgment. In their response [101] to plaintiff's statement of additional facts, defendants also move to strike portions of plaintiff's statement of additional facts. On August 18, 2014, defendants moved [104] to supplement their memorandum in support of summary judgment.

Plaintiff was a tenured school psychologist employed by the District. In a tenured staff evaluation document dated April 28, 2008, certain instances of unsatisfactory conduct on plaintiff's part during the 2007-08 school year were set out and a detailed listing of what was expected of him in the 2008-09 school year was also set forth. This evaluation concluded by stating: "The Administrative Team has been very disappointed with your job performance for the

---

[1] Julie Evans was also named as a defendant but the claims against her have been dismissed previously by the court [56]. Evans is an employee of the Illinois State Board of Education (ISBE).

1

2007-08 school year. Our expectation is that you will adhere to the job responsibilities as mentioned on this document for the 2008-09 school year. Failure to comply and adhere to the above mentioned responsibilities may result in non-renewal of your contract in spring 2009." Plaintiff's contract was renewed in 2009. No disciplinary proceedings were brought against him during the 2008-09 school year. Plaintiff did not receive any written tenured staff evaluations after the one dated April 28, 2008 and prior to his termination on January 31, 2011 though District policy called for him to receive such an evaluation in April 2010.

In January 2010, a series of emails among plaintiff, defendants Segersten and Tobias, and Barb Hageman, discussed an incomplete psych report submitted by plaintiff. In a series of emails between Segersten and plaintiff in March 2010, Segersten inquires of plaintiff about reports due from plaintiff that were not prepared. Segersten states she is not happy with the reports being late and says she expects "reports to be done and submitted on time on a regular basis." On April 16, 2010, Segersten sent plaintiff an email that stated: "I was under the understanding that you had the report done for the student that we need to meet immediately on. Tina is trying to schedule the meeting, but she does not have the report."

On October 7, 2010, Segersten sent plaintiff a letter directing him to attend an investigatory meeting "which may lead to disciplinary action, up to and including dismissal." The letter stated the "purpose of this meeting is for the administration to discuss several concerns regarding your employment. The administration will be discussing job performance deficiencies, including your failure to properly provide and/or document services provided to special education students. The administration will also be discussing conduct deficiencies, including your failure to abide by District policies governing attendance and Internet usage."

Plaintiff did not attend the scheduled meeting. He responded to this letter with an email on October 12, 2010 which stated among other things: "Given the threatening tone of your letter, I will not be attending any meetings with you without <u>my choice</u> of a representative." "I would like the <u>entire</u> record of all internet usage by junior high staff members for the previous three years. I have no idea what your internet usage concern is but seeing everyone's record will help determine whether your approach to this matter is an example of selective enforcement."

Plaintiff's email went on: "It is an interesting coincidence that your capricious attack on me comes about the day after I spoke to parents about your school's lack of interventions in math, as well as your decision not to progress monitor in math. I guess there is nothing to monitor if you don't have an intervention. My questions to you about how you want to deal with re-evaluations for kids with LD in math have gone unanswered. I remember you saying after reviewing my pysch report, that it didn't make sense to talk about math to the parents but I decided as a team member it was my right (and ethical duty) to discuss math with the parents. If you were trying to silence me, then I'm pretty sure that's a legal issue.

"I have also heard that you alone decided which kids at JH would get reading interventions, and that many of those are actually higher than the cutoff score of 25% and that there were students under 10% who were getting no RTI interventions in reading. I don't know if this is true, but my input as the school psychologist was never sought out. Maybe you ran it by another psychologist. Even if you did, this should have been a team decision. I welcome the chance to hear from the team members who made this decision as I can find no one who will say they took part in such a process.

"I believe this meeting and all the concerns are based in your attempt to intimidate (or bully as I've heard it described by more than a dozen JH staff members) so that I not only stop exercising my professional responsibilities on behalf of students, but also that I'm afraid to questions [sic] things like your decisions made alone and behind closed doors.

"Once all my requested documents are provided, let's coordinate the meeting."

On October 14, 2010, Segersten sent a letter to plaintiff stating among other things that plaintiff's failure to meet with her per her administrative directive was "an act of insubordination warranting disciplinary action. It directed plaintiff to attend a rescheduled investigatory meeting on October 19, 2010 and stated: "Please be advised that you cannot dictate the terms of this meeting nor set conditions for your appearance at this meeting." It concluded, "further failure to attend may result in disciplinary action, up to and including a recommendation for your dismissal from employment."

Plaintiff responded to Segersten's October 14, 2010 letter with an October 15, 2010 email. This email included the following, among other things: "Thank you for the letter ratcheting up your intimidation attempt. Has Lauri asked you about my allegations, yet? I'd love to see if there are any 'sunshine' laws that would apply to that meeting.

"Please send me any verifiable documentation that a) you have direct supervisory and disciplinary authority over me (and psychologists specifically) in a contractually binding, legal sense, and b) documentation that I have no rights to bring my choice of representative(s). Lauri has already sent me an email saying she wants to meet with 'my' 'reps' and yourself. Doesn't her invitation trump any kind of directive from you (kind of a rhetorical question isn't it?) Until you provide these items I have no way to know whether you have the right to demand my presence at a meeting without my choice of reps and/or without knowing of what I am to be accused.

"You will forgive me if I have trouble believing that you are actually conscientiously following the letter of the law or any contractual definition. I have direct, concrete evidence that you systematically ignore the law, making your own decisions in direct contradiction to those laws. You could be making things up and trying to bully me into a meeting without any real authority to do so. Provide the documentation, I will verify it, and then contact you about a meeting."

Later the email states: "I understand your desire to impose your vengeance upon me after your first attempt at intimidation did not work. I have proven a beacon of sorts for those who have been too scared to call you out on your pathetic attempts to set yourself above the law. I imagine this irritates you seeing as how intimidation has always worked well for you here.

"I'll check my email sometime on Monday. If you can prove you have the right to do what you say; then I would be glad to have the meeting on Tuesday. If not, I guess it's back in Lauri's court and I won't be going to any meetings with you without Lauri and my choice of reps.

"Good try, Margaret, but the vendetta's on hold for now." Plaintiff sent copies of this email to Tobias (the superintendent) and two school staff members.

On October 17, 2010, plaintiff emailed Julie Evans, the ISBE's Special Education Principal Consultant. In this email, plaintiff advised Evans of various actions taken by Segersten which he believed were improper concerning special education students and their parents. The substantive part of this email ended as follows: "In conclusion, it is my opinion that Ms.

3

Segersten has not only repeatedly infringed upon the rights of students and their parents, but also systematically dismantled our school's capacity to provide a continuum of services within the building."

In an October 18, 2010, memo to plaintiff, Tobias advised plaintiff that a series of meetings would occur on October 19, 2010. The first with plaintiff, Segersten, and Tobias, would address the allegations he made to the ISBE. Immediately following that meeting, would be the rescheduled investigatory meeting set by Segersten in her October 14, 2010 letter to plaintiff. A third meeting would occur later in the day including plaintiff and several other staff members to address plaintiff's concerns regarding special education placements. The memo concluded by addressing plaintiff's October 15, 2010 email discussed above. Tobias stated plaintiff's email was "inappropriate and unprofessional." She went on to say: "You are making vitriolic personal attacks on an administrator through e-mail copied to other staff which is intentionally damaging and unnecessary if your intent is to legitimately address concerns with District programs. You are expected to bring your concerns forth in a productive manner."

The investigatory meeting was actually held on October 20, 2010. After this meeting, and another on November 3, 2010, Segersten prepared an amended recommendation that the school board issue plaintiff a notice of remedial warning. The recommendation, which was sent to plaintiff, advised him he and/or his representative could meet with the school board in closed session. It does not appear he or any representative chose to do so.

In response to this recommendation, plaintiff emailed the school board members and the entire District staff, stating he believed Segersten was "intentionally attempting to besmirch my professional reputation, and is doing so in retaliation because I filed a complaint with ISBE containing serious allegations about her conduct as it relates to special education rights of many students and their parents." This email also stated that he had "multiple special education certified staff who have corroborated my allegations in writing, as well as written correspondence from parents expressing how they believe their rights were not properly provided and misrepresented to them verbally."

At a November 10, 2010 meeting, the school board voted unanimously to give plaintiff a notice of remedial warning. The notice of remedial warning contained numerous specific actions plaintiff was required to perform.

On December 7, 2010, Tobias sent plaintiff a memo directing him to attend an investigatory meeting on December 8, 2010 in Segersten's office to discuss "several concerns regarding your employment, including your failure to abide by directives issued to you in the November 10, 2010 Notice of Remedial Warning." Plaintiff was advised "[i]f you fail to appear at this meeting, you will be considered insubordinate and will be disciplined accordingly."

Plaintiff did not attend the investigatory meeting on December 8, 2010. Tobias rescheduled this meeting for 13 separate additional dates several of which provided for plaintiff to appear via telephone but plaintiff never appeared. He reported being too ill to attend. On January 12, 2011, Tobias sent plaintiff a letter which included a questionnaire "which directs you to provide information regarding our concerns with your conduct, including your failure to abide by directives issued to you in the November 10, 2010 Notice of Remedial Warning." Plaintiff was directed to answer the questionnaire, return it to the District's Administrative Office by 5 p.m. on January 13, 2011 and to attend a follow-up investigatory meeting on January 14, 2011.

Plaintiff did not answer the questionnaire. A meeting with plaintiff, his representative, Tobias and another administrator eventually occurred on January 18, 2011.

On January 24, 2011, Tobias provided plaintiff with a notice of her recommendation to the school board that plaintiff be dismissed from employment. This notice set forth (among other deficiencies) plaintiff's failure to properly report absences from work, a detailed discussion of deficiencies in psychological reports plaintiff prepared for three special education students, several instances of communications with Segersten which were not "professional, respectful and appropriate" as the November 10, 2010 notice of remedial warning required, and failure to follow all directives from the administrative staff when plaintiff failed to participate in the investigatory meeting as originally scheduled or on any of the next 13 occasions on which it was rescheduled.

Plaintiff was advised he could attend, with a representative, the special closed-session school board meeting at which it would consider his dismissal and would be given an opportunity to address the board and respond to the reasons for the dismissal recommendation. Plaintiff did not choose to attend this meeting, because he believed it would be fruitless to do so, and the board voted to dismiss him on January 31, 2011.

Plaintiff claims he was dismissed without due process. However, plaintiff was given an opportunity to appear before the school board and respond to the charges against him but he declined to do so. He agreed with defendants' statement in its LR56.1 statement of facts that the only reason he did not appear was his belief that an appearance would have been fruitless. However, he cites no evidence to support this belief. His procedural due process claim based on bias fails.

Plaintiff argues defendants deprived him of his procedural due process rights "by intentionally hiding and refusing to explain the evidence contained in the Tobias report." He contends that if he had "been given access to this fabricated evidence, he would have been able to incorporate the truth of his allegations (and the cover-up underway) into the telling of his side of the story." By the "Tobias report", plaintiff means a report dated October 28, 2010 Tobias made from her investigation of plaintiff's charges of violations in the provision of special education services. The fabricated evidence he references are Tobias's assertions she interviewed Susan Weiss and Linda McWherter in the course of this investigation and that she reviewed the educational records of all special education students at the junior high school. Both Weiss and McWherter told plaintiff on October 29, 2010 that Tobias did not interview them. Plaintiff, therefore, had this information in advance of both the November 10, 2010 school board meeting where the notice of remedial warning was adopted and the January 31, 2011 school board meeting at which his employment was terminated. Plaintiff chose not to attend either of these meetings. He certainly could have advised the school board of this discrepancy between Tobias's report and the statements of Weiss and McWherter if he had elected to attend either meeting to present his response to the charges. As to his argument that Tobias's statement that she reviewed the records of all special education students at the junior high, plaintiff does not indicate where in the summary judgment record evidence of the falsity of this statement appears. He says in his brief that he has in his possession documents which indicate six special education students' records were not reviewed but he does not direct the court where to find this evidence in the record or even say it is in the record. This argument fails for lack of evidentiary support.

5

Diadenko v. Folino, 741 F.3d 751, 758 (7th Cir. 2013) ("a party must show what evidence it has that would convince a trier of fact to accept its version of the events.")

Plaintiff also argues his substantive due process rights have been denied because defendants' actions "shock the conscience" in that they intended to injure him by depriving him of his property, his job with the District. Plaintiff cites Steen v. Myers, 486 F.3d 1017 (7th Cir. 2007) in support of this claim. Steen involved a police high-speed chase of a motorcycle which concluded with the motorcycle crashing. The court held no substantive due process violation occurred because the plaintiffs did not show conscience-shocking behavior and an intent to cause harm unrelated to a legitimate government interest. However, there is nothing conscience-shocking about a school district employee being subjected to disciplinary action and being given an opportunity to appear before the school board and respond to the charges but declining to do so. Steen does not help plaintiff.

A "plaintiff who challenges the substance of a government decision on substantive due process grounds (as opposed to challenging the process the decision-makers used on procedural due process grounds) must show (1) that the decision was arbitrary and irrational, and (2) that the decision-makers either committed another substantive constitutional violation or that state remedies are inadequate." Strasburger v. Bd of Educ.of Hardin County, 143 F.3d 351, 357 (7th Cir. 1998). Plaintiff fails to meet this standard. He presents no evidence the decision to discipline and ultimately terminate him was arbitrary and irrational. The November 10, 2010 notice of remedial warning and the January 24, 2011 notice of recommendation of dismissal provided many reasons that support the disciplinary action taken. While plaintiff contends the disciplinary action was undertaken in retaliation for his complaints about legal violations against special education students and their parents, he does not present evidence that refutes the findings concerning the deficiencies in his reports or that he failed to appear for over a dozen scheduled meetings to discuss his performance problems. Defendants' actions were not arbitrary or irrational regardless of their motivation. Plaintiff's substantive due process claim fails.

Plaintiff claims his First Amendment free speech rights were violated by defendant's actions. He claims they did this by retaliating against him when he complained about violations of the legal rights of special education students and their parents. "In order to establish a First Amendment retaliation claim, a public employee must show that: (1) she engaged in constitutionally protected speech; (2) she suffered a deprivation because of her employer's action; and (3) her protected speech was a but-for cause of the employer's action." Diadenko v. Folino, 741 F.3d 751, 755 (7th Cir. 2013). Plaintiff's initial burden of proof is to demonstrate that his protected speech was at least a motivating factor in defendants' disciplinary action against him. Id., at 756. Once he makes this showing, the burden shifts to the defendants to come forth with evidence that other factors influenced the decision and the decision would have been made absent the protected speech. Id. This burden-shifting approach was established in Mt. Healthy City School Dist. v. Doyle, 429 U.S. 274, 287 (1977). The court will refer to this burden-shifting approach as the Mt. Healthy approach.

First Amendment retaliation claims made by government employees have also been analyzed on summary judgment under the same methods used in Title VII cases – the direct method and the indirect method. Hobgood v. Illinois Gaming Bd., 731 F.3d 635, 641-42 (7th Cir. 2013). Plaintiff expressly states he is relying on the direct method only. Under the direct

6

method, "plaintiff must offer evidence: (1) that he engaged in protected activity, (2) that he was subjected to an adverse employment action, and (3) that there was a causal link between the protected activity and the employment action." Id., at 642.[2]

As to the first prong, whether plaintiff engaged in activity protected by the First Amendment, a two-step inquiry is required to determine whether a public employee's speech is entitled to First Amendment protection. Lane v. Franks, __ U.S. __, 134 S.Ct. 2369, 2378. (2014). First, the court determines whether the employee spoke as a citizen on a matter of public concern. If no, the employee has no First Amendment claim based on his employer's reaction to the speech. Id. If yes, then the question becomes whether the government employer had adequate justification for treating the employee differently than any other member of the general public. Id. Speech as a citizen may trigger First Amendment protection but "'when public employees make statements pursuant to their official duties, the employees are not speaking as citizens for First Amendment purposes, and the Constitution does not insulate their communications from employer discipline.'" Id. (quoting, Garcetti v. Ceballos, 547 U.S. 410, 421 (2006).

Defendants argue plaintiff's speech was not constitutionally protected because he was not speaking as a citizen but pursuant to his official duties. Their argument is that throughout the disciplinary process and in his deposition plaintiff has asserted that his actions concerning his complaints about wrongdoing on the part of Segersten were related to his official job duties and professional responsibilities. They further contend that "the exorbitant amount of work time which [plaintiff] admittedly expended in furtherance of his complaint strongly indicates that his complaints, as part of his job duties, were not protected within the meaning of the First Amendment." However, it is not clear why plaintiff's opinion as to whether his actions were a part of his official duties should be controlling. While plaintiff may have switched positions on this point in an attempt to make a case for himself, Tobias's recommendation for dismissal characterizes plaintiff's activities in this regard as "a personal grievance," so position-switching has occurred on both sides as to whether plaintiff's speech was within the context of his official duties.

[T]he mere fact that a citizen's speech concerns information acquired by virtue of his public employment does not transform that speech into employee –rather than citizen– speech." Id., at 2379. The critical question "is whether the speech at issue is itself ordinarily within the scope of an employee's duties, not whether it merely concerns those duties." Id. The evidence shows that at least part of plaintiff's speech was not within the scope of his job duties. While his communications with Segersten, Tobias, and the school board --his chain of command at the District – arguably falls within the scope of his job duties, his complaint to Evans at ISBE about Segersten is outside that chain.

In Swetlik v. Crawford, 738 F.3d 818 (7th Cir. 2013), plaintiff, a police detective, was held to have made his complaints about the police chief to the deputy chief and investigators pursuant to his official duties but to have made his statements about the chief to the Common

---

[2] Under either the Title VII-style direct method or the method as articulated in Diadenko, the first and second prongs are essentially the same. Plaintiff's termination satisfies the second prong under either method. The following discussion concerning protected activity applies equally to the first prong of either method.

Council and Police and Fire Commission in his capacity as a citizen. Id., at 826. Since his statements to the Common Council and Police and Fire Commission concerned the police chief's "effectiveness and integrity . . . specifically with regard to his handling of police procedures such as transporting and booking suspects" they were statements on matters of public concern. Id., at 827. The court noted specifically that "Swetlik's accusation that Chief Kingsbury directed an officer to 'lie to other agencies' was a serious accusation that implicated the chief's integrity and ability to fulfill his duties as the head of the police department." Id.

Similarly here, plaintiff's complaint to Evans goes to the integrity and effectiveness of Segersten, the principal of the public junior high school, in performing her duties and asserts Segersten is operating outside the bounds of the law governing special education students. Whether the junior high school principal is illegally denying special education students the educational benefits they are entitled to is clearly a matter of public concern. "Speech involves matters of public concern when it can be fairly considered as relating to any matter of political, social, or other concern to the community." Lane, 134 S.Ct. at 2380 (internal quotation marks and citation omitted). The first part of the test set forth in Lane, that the plaintiff was speaking as a citizen on a matter of public concern has been met. Id., at 2378.

The next step in determining whether plaintiff engaged in activity protected by the First Amendment is to determine whether defendants had adequate justification for treating the employee differently than any other member of the general public. Id. Government employers have legitimate interests in promoting efficiency and integrity in the discharge of official duties and maintaining proper discipline. Id., at 2381. This may impact a government employee's right to speak even as a citizen on a matter of public concern. Id., at 2380.

Defendants have not raised any governmental interest that would preclude First Amendment protection to plaintiff's speech. They do not contend any such interest overrode plaintiff's right to bring his complaints about Segersten and the junior high special education program to Evans. Their arguments go only to the employee versus citizen speech issue discussed above and to the question whether other factors influenced the disciplinary action and that the disciplinary action would have been taken against plaintiff absent the speech. Since plaintiff spoke as a citizen on a matter of public concern and no governmental interest has been shown to justify treating him differently than a member of the general public as to this speech, plaintiff engaged in activity protected by the First Amendment. Id., at 2380-81. The first prong for First Amendment retaliation has been satisfied. Diadenko, 741 F.3d at 755.

Having satisfied the first and second prongs of both the Title VII-style method and the method articulated in Diadenko, plaintiff's First Amendment retaliation claim comes down to the third prong of these methods – causation. Plaintiff advances his argument in terms of the Title VII-style approach. He contends the evidence presents a convincing mosaic of circumstantial evidence from which it can be inferred the action taken against him was caused by his protected speech. Defendant argues the Mt. Healthy approach contending that factors other than plaintiff's speech influenced the decision and the same decision would have been made absent the protected speech.

Plaintiff says the action taken against him was suspiciously timed. He argues he first addressed Segersten's violation of special education statutes during the first or second week in September 2010 in Segersten's office. However, he does not point to any evidence in the record

8

to support this. No such evidence appears in his LR56.1 statement of additional facts. He argues that despite having failed to perform required evaluations of his performance between the time of his April 28, 2008 evaluation (which noted several unsatisfactory performance items that needed correcting) and the beginning of the 2010-11 school year, Segersten became interested in correcting plaintiff's performance only after he raised the issue of her unlawful actions at the beginning of September. Again, he points to no evidence to support his claim of addressing Segersten's unlawful activities at that time. Additionally, the series of emails in January, March and April 2010 (discussed above) setting forth Segersten's dissatisfaction with plaintiff's performance shows Segersten's concern with plaintiff's performance did not arise only after the beginning of the 2010-11 school year.

Plaintiff argues use of the April 2008 evaluation to "build a disciplinary process upon is also suspicious in and of itself." He contends he underwent a remediation process in the 2008-09 school year following the April 2008 evaluation. He maintains that had the administrators fulfilled their duty to evaluate him during the 2009-2010 school year then that evaluation would have superceded the remediation plan arising from the April 2008 evaluation. However, the failure of defendants to formally evaluate plaintiff does not, as plaintiff seems to suggest, imply they were satisfied with his performance. Segersten's communications with him in the January, March and April 2010 emails indicate she was not satisfied with plaintiff's performance.

Plaintiff argues other similarly situated psychologists were treated differently than plaintiff because he asked Segersten to supply him with exemplars of reports from other psychologists she found proper and she refused to do so. From this plaintiff concludes he was being required to prepare reports no other district psychologist was required to prepare. This is simply speculation. He provides no evidence other district psychologists did not have to prepare the same types of reports required of him. Plaintiff requested these exemplars after the November 10, 2010 notice of remedial warning. Segersten responded to his request by stating the district "trusts that you have sufficient professional capacity, experience, initiative, and resources to determine how to draft proper psychological reports." Plaintiff points to no evidence or authority indicating defendants had any duty to provide exemplars of these reports.

Plaintiff also argues that Tobias's fabrication of elements of the Tobias Report (discussed above) shows she was trying to cover-up the truth of plaintiff's allegations about the legal violations in the special education program. As noted above, the record does not support plaintiff's claim that Tobias lied about reviewing the records of all of the junior high special education students. He does present evidence that Tobias, contrary to her report, did not interview Weiss and McWherter. However, taking all of the evidence properly presented (including the evidence discussed below), the circumstantial evidence does not create a convincing mosaic of circumstantial evidence from which a jury could infer intentional discrimination in plaintiff's being subject to the notice of remedial warning and terminated.

Turning to the Mt. Healthy approach, even assuming plaintiff's speech was a motivating factor in the disciplinary action taken against him, the evidence defendants would have taken the same action against him is compelling. "A borderline or marginal candidate should not have the employment question resolved against him because of constitutionally protected conduct. But that same candidate ought not to be able, by engaging in such conduct, to prevent his employer

9

from assessing his performance and reaching a decision not rehire on the basis of the record." Mt. Healthy, 429 U.S. at 286.

The evidence shows defendants were dissatisfied with plaintiff's performance at the end of the 2007-08 school year when he received the unsatisfactory evaluation on April 28. 2008. The emails of January, March, and April 2010 show dissatisfaction with his performance at that time as well. When the disciplinary process which ultimately led to plaintiff's termination was commenced by Segersten's October 7, 2010 letter to plaintiff (directing him to attend an investigatory meeting to discuss plaintiff's performance deficiencies including failures regarding services to special education students, failure to abide by the District's policies governing attendance and internet usage,) plaintiff responded by saying he was not going to be attending any meetings without his choice of representative and demanding to see the entire record of all internet usage of junior high staff members for the previous three years. His response went on to raise his complaints about Segersten's conduct of the special education program at the junior high and concluded by saying "[o]nce all my requested documents are provided, let's coordinate the meeting."

When Segersten responded telling him he could not dictate the terms of the meeting nor set conditions for his appearance, plaintiff responded with an email (which he copied to Tobias and two other staff members) saying "[t]hank you for the letter ratcheting up your intimidation attempt" and telling Segersten to send him "verifiable documentation" she had direct supervisory authority over him and that when she provided the documentation, he would verify it, and then contact her about the meeting. He concluded the email: "Good try, Margaret, but the vendetta's on hold now." He then sent a complaint to the ISBE. When the investigatory meeting was eventually held, and a recommendation made that the school board issue plaintiff a notice of remedial warning, rather than attending the closed-door school board meeting to respond to the notice, plaintiff responded by emailing the entire District staff as well as the school board stating he believed Segersten was "intentionally attempting to besmirch my professional reputation, and is doing so in retaliation because I filed a complaint with ISBE containing serious allegations about her conduct as it relates to special education rights of many students and their parents."

After the school board issued the notice of remedial warning, Tobias scheduled another investigatory meeting to address plaintiff's performance problems occurring after the notice of remedial warning. Plaintiff did not attend this meeting. Tobias rescheduled this meeting 13 times. Plaintiff did not attend any of these rescheduled meetings. A meeting finally occurred on January 18, 2011. It resulted in a recommendation of dismissal from Tobias to the school board. Plaintiff chose not to attend the school board meeting at which he was dismissed.

Plaintiff chose to respond to the inquiry about his performance deficiencies by going on the attack and bypassing the process. His conduct during the disciplinary process left the school board with little choice but to terminate him. The record shows plaintiff had performance deficiencies prior to his complaining about the special education program's administration. It shows he, for the most part, chose to respond to the inquiry into his deficiencies by being insubordinate and uncooperative and by launching a district-wide campaign against Segersten instead of using the District's disciplinary process to make his case that his performance was acceptable and the disciplinary proceedings against him unfounded. In light of all the evidence, it is clear that even if plaintiff's speech were a motivating factor in the disciplinary process being

started against him, the same decision would ultimately have been reached against him in the end.

Plaintiff's First Amendment retaliation claim fails when analyzed under either the Title VII-style method outlined in <u>Hobson</u> or the method outlined in <u>Diadenko</u> employing the <u>Mt. Healthy</u> burden-shift approach.

Based on the foregoing, defendants' motion [87] for summary judgment is granted. Defendants' motion to strike contained in their response [101] to plaintiff's statement of additional facts and their motion [104] to supplement are denied. Judgment is entered in favor of defendants and against plaintiff on all claims. This case is terminated.

Date: 8/19/2014                ENTER:

_____
United States District Court Judge

Notices mailed by Judicial Staff. (LC)